UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:16-cv-34-FDW

| | |
|---|---|
| JIMMY ALLEN ROBERTS, | ) |
| Plaintiff, | ) |
| vs. | ) ORDER |
| FRANK L. PERRY, et al., | ) |
| Defendants. | ) |

**THIS MATTER** comes before the Court on a Motion for Summary Judgment by Defendants Betty Brown, Frank L. Perry, and Mike Slagle, (Doc. No. 35).

## I. BACKGROUND

### A. Procedural Background

Pro se Plaintiff Jimmy Allen Roberts, a North Carolina state inmate currently incarcerated at Craggy Correctional Institution ("Craggy") in Asheville, North Carolina, filed this action on February 16, 2016, pursuant to 42 U.S.C. § 1983. (Doc. No. 1). Plaintiff has named as Defendants: (1) Frank L. Perry, Secretary of the North Carolina Department of Public Safety ("NCDPS"); (2) Betty Brown, Director of Chaplaincy Services with the NCDPS; and (3) Mike Slagle, Administrator of Mountain View Correctional Institution ("MVCI"). Plaintiff contends that, when he was incarcerated at MVCI, Defendants Perry, Brown, and Slagle violated the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, et seq, by failing to recognize "Nation of Israel" as an approved religion and by limiting the number of religious texts he can possess. (Id. at 8-19). To summarize Plaintiff's claim, Plaintiff

1

argues that he applied for recognition of "Nation of Israel" in 2014 by completing a form DC-572. (Id. at 4-7). In 2015, he was informed that the group would not be recognized and that his religious texts would be limited according to North Carolina Department of Public Safety ("NCDPS") policy. (Id.). Plaintiff claims this impedes his ability to practice his religion. (Id.). Plaintiff also claims that he attempted to contact North Carolina Prisoner Legal Services ("NCPLS") in 2015 for legal assistance, but they declined to represent him. (Id. at 19-24). According to Plaintiff, this constitutes a violation by Defendants of his First Amendment right to access to the courts. (Id.). Plaintiff requests declaratory and injunctive relief. (Id. at 24-29).

Defendants filed the pending summary judgment motion on May 23, 2017. (Doc. No. 35). On May 31, 2017, this Court entered an order in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the summary judgment motion and of the manner in which evidence could be submitted to the Court. (Doc. No. 39). On June 1, 2017, Plaintiff filed an "objection," which the Court will treat as his response to the summary judgment motion. (Doc. No. 40). Plaintiff has attached various publications and prison policies to his objection.

  **B.** **Factual Background**

    **1.** **Defendants' Summary Judgment Materials**

To support the summary judgment motion, Defendants rely on all pleadings, exhibits, and other documents incorporated into the record, including the affidavits of Defendants Brown and Slagle. In her affidavit, Defendant Brown states that, as Director of Chaplaincy services, she has encountered only one request related to Nation of Israel and that request was from inmate Plaintiff. (Doc. No. 37 at ¶ 7: Brown Aff.). Brown asserts that she has never met Plaintiff and only engaged in limited correspondence with him because Chaplain Edwards was tasked with

communicating with Plaintiff about his request. (Id. at ¶¶ 4, 5, 8). According to Brown, Plaintiff completed a form DC-572, or a Request for Religious Assistance, and the form was transmitted to Brown's office in September 2014. (Id. at ¶¶ 9-11; Ex. A). The request was then forwarded to the Religious Practices Committee ("RPC") on October 2, 2014, in accordance with Religious Services Policy procedures. (Id. at ¶¶ 10, 14; Ex. A, B).

The form indicates that Plaintiff was seeking recognition of "Nation of Israel" as a religion and includes information from two pastors about the group. (Id. at ¶¶ 11-12). The pastors, who are in Kentucky and Missouri, do not indicate that they have ever met Plaintiff. (Doc. No. 37-1 at 8-9). The Nation of Israel information supported by the pastors indicates that church membership is limited to "racially pure Anglo-Saxon" individuals—meaning whites only, and the information further refers to Jews as a "mongrel race." (Id. at 11, 13). The church also allows inmates to serve as priests. (Id. at 13). Brown asserts in her affidavit that, although she does not substantively consider DC-572s, she does cursorily review them before forwarding them to the RPC. (Doc. No. 37 at ¶¶ 13-14, Ex. B). Brown opines that neither the group's racist ideology nor the sanctioning of inmates as priests is conducive to correctional settings. (Id. at ¶ 13).

On November 12, 2014, Plaintiff requested to know the status of his DC-572. (Id. at ¶ 16, Ex. D). On December 16, 2014, Brown responded that the RPC was considering Plaintiff's request. (Id. at ¶ 17, Ex. D). On December 4, 2014, the RPC determined that, because of the group's discriminatory rhetoric and Plaintiff's security threat status, Nation of Israel would not be recognized for purposes of the Religious Practices Manual ("RPM"). (Id. at ¶ 18, Ex. E). Specifically, the RPC concluded that Nation of Israel does not necessarily hold itself out to be a religious group separate from Christianity or Messianic Judaism requiring a need for separate

3

recognition. (Id. at ¶ 23). Further, the RPC concluded—from the group's and Plaintiff's own submitted materials—that the group is a white supremacist or racially exclusive organization which excludes non-whites from membership. (Id.). The RPC also concluded that Plaintiff, who was designated as a Messianic Jewish inmate, was permitted to worship that faith in whatever fashion his custody level permitted, including receiving a Kosher diet, as long as he is not disruptive or presenting a threat to the institution. (Id. at ¶¶ 24, 25, 27). The RPC also noted that Plaintiff could be accommodated though private devotion and Messianic Jewish or Christian services because Messianic Jewish designation and his beliefs appeared consistent with those faith practices. (Id.).

After Brown was informed of the December 2014 RPC meeting, she requested that Chaplain Edwards meet with Plaintiff in January 2015 to inform him of the RPC's determination. (Id. at ¶ 20). In May 2015, Plaintiff wrote to Brown again and requested to appeal the RPC's determination. (Id. at ¶ 21, Ex. F). Edwards again spoke with Plaintiff and informed him of the RPC consensus. (Id. at ¶ 22, Ex. F).

As to Plaintiff's challenge to his designated security status, Brown states in her affidavit that neither she nor the RPC make determinations related to security threat or risk groups ("STG" or "SRG") and did not designate Plaintiff as a member of either group. (Id. at ¶ 26). Brown further states that neither she nor the RPC make determinations related to the permissibility of publications. (Id. at ¶ 28). She states, however, that Plaintiff would be able to receive any publications, including Nation of Israel publications, as long as they were approved by the review policy set forth by the publications policy and committee. Generally, to receive publications, the materials must be free of gang-related information, racist information, violence, and the like. (Id. at ¶ 29). Brown asserts that she did not review any materials indicating that

4

Plaintiff was prohibited from possessing appropriate religious material. (Id. at ¶ 30). Brown also did not see any information indicating that Nation of Israel beliefs require Plaintiff to possess more religious materials than other inmates. (Id.). Facilities make determinations on how many religious texts that inmates may possess based on the facility's security and operational needs. (Id.).

Finally, Brown asserts that DPS has refused to recognize Nation of Israel as a group because of its hateful, racist, and separatist rhetoric, as established and documented in its own literature. (Id. at ¶ 31). Brown further opines that groups espousing racist ideals are not suitable to DPS recognition because the violence and racist ideals promoted by the groups are not suitable in a correctional setting. (Id. at ¶ 32). Such groups are usually intended to instill violence, revolt, and racism against non-white individuals. (Id.).

In support of the summary judgment motion, Defendants have also submitted the affidavit of Defendant Slagle, current Administrator of MVCI. (Doc. No. 36 at ¶ 3: Slagle Aff.). He was not the Administrator of MVCI before 2015, but was employed at the facility. (Id. at ¶ 4). Slagle asserts that he had no interactions with Plaintiff while he was housed at MVCI, and he denies that he personally infringed on Plaintiff's religious rights or blocked his access to legal representation. (Id. at ¶ 12). He also denies that MVCI staff violated Plaintiff's religious rights or impeded his access to legal representation. (Id.).

Slagle states in his affidavit that, as to Plaintiff's DC-572, MVCI staff met their obligations to process and forward the DC-572 for review by the RPC. (Id. at ¶ 5). MVCI staff were not involved in the outcome of the DC-572, as the RPC made that determination. (Id. at ¶ 6). Slagle further asserts that MVCI staff appropriately responded to and addressed each of Plaintiff's grievances related to his claims. (Id. at ¶¶ 6-8). As to Plaintiff's grievance regarding

5

religious materials or excessive books, Slagle determined that staff responded attentively to the complaints and that the responses were consistent with MVCI Standard Operating Procedures ("SOPs"), which allow inmates to possess ten books at any given time, plus approved reading material for their declared religion. (Id. at ¶ 8, Ex. A, F). Books of an unrecognized religion would not fall within the "approved reading material" from the Religious Practices Manual. (Id.).

As to Plaintiff's claims about legal representation, Slagle denies that MVCI staff has impeded Plaintiff's right to access the courts and Slagle notes that, in fact, Plaintiff was disciplined in 2016 for providing legal assistance to another inmate. (Id. at ¶ 10: Ex. C).

As to Plaintiff's designation in a Security Risk Group ("SRG") for white supremacy, Slagle states that he did not participate in Plaintiff's SRG classification. (Id. at ¶ 9, Ex. B). The documents supporting the SRG classification indicate that Plaintiff has tattoos associated with white supremacy groups. (Doc. No. 36-2 at 2).

Slagle further attests that Plaintiff was found in possession of white supremacy materials on March 16, 2016. (Doc. No. 36 at ¶ 13). Specifically, MVCI staff carried out a routine search on Plaintiff's cell and discovered materials appearing to be SRG-related, specifically white supremacist. (Id.). Specifically, staff located one book, two pamphlets, and some printed materials stapled together. (Id. at ¶ 14; Doc. No. 36-5: Ex. E, Seized Materials). Slagle asserts that the printed materials contained the words "White Warrior," "KKK," and "Ku Klux Klan." (Id.). The materials also contained anti-Jewish rhetoric, including entire sections of a newsletter called "Why We Hate Jews." (Id.). Slagle asserts that the materials further espoused violent views of stopping the "integration" or mixing of races and stating they are aimed at equipping individuals to "advance" the "Kingdom of God." See (Id.). According to Slagle, such materials

6

are not suitable for Plaintiff's possession in the prison system because they teach and espouse racist ideals and contain hateful, separatist rhetoric, including statements denouncing inter-mixing races, the Jewish faith, and African-Americans. (Doc. No. 36 at ¶ 15). Slagle opines that promotion of such ideas would lead to tension and unrest in the inmate population between inmates of different races, as well as with inmates and staff of different races. (Id. at ¶ 17). According to Slagle, this would directly pose a risk to prisons, staff, and public in North Carolina. (Id.). Slagle asserts that he reviewed the materials, determined that they were SRG-related, and retained them as contraband. (Id. at ¶ 15, Ex. E).

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must

present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

### III. DISCUSSION

#### A. Plaintiff's RLUIPA and First Amendment Claims Based on Failure to Recognize Nation of Israel and Restriction on Plaintiff's Right to Possess Religious Texts

As noted, Plaintiff purports to bring a claim arising under RLUIPA. The Court will further assume, for the purposes of this summary judgment motion, that Plaintiff also intended to bring a claim for a violation of his right to exercise his religion under the First Amendment. First, RLUIPA provides, in part: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). "RLUIPA thus protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." Cutter v. Wilkinson, 544 U.S. 709, 721 (2005). Under RLUIPA, the plaintiff must initially show that the challenged policy substantially burdens

8

his exercise of his religion. See 42 U.S.C. § 2000cc-2(b); Holt v. Hobbs, 135 S. Ct. 853, 862 (2015). The statute defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); Smith v. Ozmint, 578 F.3d 246, 251 (4th Cir. 2009). A "'substantial burden' is one that puts substantial pressure on an adherent to modify his behavior and to violate his beliefs, [] or one that forces a person to choose between following the precepts of her religion and forfeiting governmental benefits, on the one hand, and abandoning one of the precepts of her religion on the other hand." Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006) (quotations, citation, and alterations omitted).

Once the inmate makes a prima facie showing, the burden shifts to the government to prove that "the burden in question is the least restrictive means of furthering a compelling governmental interest." Ozmint, 578 F.3d at 250. "'RLUIPA adopts a . . . strict scrutiny' standard." Couch v. Jabe, 679 F.3d 197, 203 (4th Cir. 2012) (quoting and citing Lovelace, 472 F.3d at 198 n.8). Under RLUIPA, the court must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Cutter, 544 U.S. at 723 (quotation omitted). "However, 'a court should not rubber stamp or mechanically accept the judgments of prison administrators.' . . . Rather, due deference will be afforded to those explanations that sufficiently 'take[] into account any institutional need to maintain good order, security, and discipline.'" Couch, 679 F.3d at 201 (quoting Lovelace, 472 F.3d at 190).

As for Plaintiff's First Amendment claim, the Free Exercise Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion." U.S. CONST. amend. I. The Supreme Court has applied the First Amendment to the states

9

through the Fourteenth Amendment. See Everson v. Bd. of Educ., 330 U.S. 1, 15 (1947). To state a free exercise claim under the First Amendment, a plaintiff must allege facts sufficient to show that he held a sincere religious belief, and that the official action or regulation substantially burdened his exercise of that belief. Hernandez v. Comm'r, 490 U.S. 680, 699 (1989). A prison policy that substantially burdens an inmate's ability to practice his religion withstands a First Amendment challenge when it is "reasonably related to legitimate penological interests."[1] O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987) (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)). In deciding whether a defendant's actions can be sustained as reasonably related to legitimate penological interests, the court must consider the following four factors: (1) whether there is a valid, rational connection between the regulation and the legitimate penological interest; (2) whether there are alternative means of exercising the right in question that remain open to prisoners; (3) the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and (4) whether ready alternatives exist which accommodate the right and satisfy the penological interest. See Turner, 482 U.S. at 89-90. "As a result, if prison officials demonstrate that a challenged policy is pursuing a legitimate governmental objective, and demonstrates some minimally rational relationship between that objective and the means chosen to achieve that objective," courts must approve of those means. Lee v. Johnson, 793 F. Supp. 2d 798, 805 (W.D. Va. 2011) (quoting

---

[1] Claims brought under the First Amendment are subject to a less demanding standard of proof than claims brought under RLUIPA, with RLUIPA claims requiring "strict scrutiny instead of reasonableness." See Lovelace, 472 F.3d at 199 n.8. Thus, the First Amendment affords less protection to an inmate's free-exercise rights than does RLUIPA. Id. The initial burden on the inmate is the same under both RLUIPA and the First Amendment—i.e., to show that his right to free exercise of religion has been substantially burdened. Brown v. Ray, 695 F. Supp. 2d 292, 300 (W.D. Va. 2010). However, if a plaintiff fails to present evidence of a RLUIPA violation sufficient to survive summary judgment, it follows that his First Amendment claim also fails.

Hines v. S.C. Dep't of Corrs., 148 F.3d 353, 358 (4th Cir. 1998) (internal quotation marks omitted)). "Several factors are relevant to this reasonableness determination, including whether there is a logical connection between the asserted interest and the challenged policy, whether accommodating the inmate's rights would severely impact allocation of prison resources, and whether inmates retain alternative means of exercising their religious rights." Id.

**1. Group Recognition**

In support of their summary judgment motion, Defendants first argue that the materials submitted by Plaintiff with his Complaint and with his DC-572 indicate that Nation of Israel is not a separate religion for purposes of recognition and that Plaintiff has, therefore, has not proven that his rights have been violated under either RLUIPA or the First Amendment. The Court agrees, as these materials indicate that Nation of Israel is a group comprised of Messianic Jewish and Christians who disagree with the mixing of races, rather than a separate religion. (Doc. No. 1-2 at 3-7; Doc. No. 37, Ex. A at 10-11). Plaintiff's materials used to support his DC-572 include a letter from Pastor Donald Elmore, stating that Plaintiff is capable of leading the "functions of a Christian Church." (Doc. No. 37-1 at 9). It appears that the premise and practices of the group lie in the same texts studied by both Messianic Jewish and Christian faith groups; however, their interpretations as of the texts differ, primarily in that Nation of Israel promotes white supremacy and anti-Semitism—racist ideologies that Nation of Israel appears to contend are supported by Biblical scripture. See (Doc. No. 1-2 at 3-7; Doc. No. 37; Doc. No. 37-1 at 10-11: Ex. A). That is, according to Nation of Israel's own Statement of Beliefs: "The Nation of Israel . . . is comprised mainly of former Christians and Messianics, who have come to recognize that modern Judeo Christianity in its 3,000 plus cultic variations, i.e., denominations is counter conductive to the religion depicted in Scripture." (Doc. No. 37-1 at 10). Further,

11

Plaintiff has not alleged a substantial burden on his ability to practice his beliefs according to the Nation of Israel, given that he is designated a Messianic Jewish inmate and is capable of participation in both Messianic Jewish and Christian services. See (Doc. No. 37 at ¶¶ 17-18).

Defendants further note that, according to the Southern Poverty Law Center, which researches and tracks right-wing, extremist hate groups in America, the "Church of Israel" and Pastor Gayman are "leading ideologues of the racist and anti-Semitic Christian Identity religion[.]" See (Doc. No. 38-1 at 1: Appendix A to Mem.; Doc. No. 38-2: Appendix B to Mem.). According to the Anti-Defamation League of America, Dan Gayman was associated with violent individuals and violent attacks such as those by Eric Rudolph, who was convicted of detonating bombs at the 1998 Olympics and an abortion clinic. See (Doc. No. 38-3 at 8: Appendix C to Mem.). Defendants contend that the sources consulted for Defendants' attached appendices concur that Dan Gayman, his congregation, the Nation of Israel, and the Christian Identity movement are the same. See (Doc. No. 38-4: Appendix D to Mem.). The Anti-Defamation League materials further state that, within the Christian Identity movement, "[o]verall level of criminal activity is high, ranging from hate crimes to acts of terrorism." See (Doc. No. 38-3 at 2).

This Court finds that Defendants have presented evidence on summary judgment showing that Nation of Israel is not a separate religion for purposes of recognition in the North Carolina prisons. Rather, it is a group that espouses racist, white supremacy ideologies, and it is a part of the so-called "Christian Identity" movement. In any event, assuming for purposes of discussion that Nation of Israel is recognizable as a religion, it is well settled that RLUIPA does not require a prison to accommodate a religious practice that jeopardizes institutional security, and Defendants have presented ample evidence on summary judgment that this group does

12

jeopardize institutional security. See Cutter v. Wilkinson, 544 U.S. 724, 722 (2005) ("We do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety."). Courts have repeatedly held that religious materials or groups possessing violent or racist messages are not entitled to religious protections. Brown v. D.O.C., 265 F. App'x 107, 110 (3rd Cir. 2008) (confiscation of Five Percenter newspapers did not violate the plaintiff's rights where newspapers included articles with revolutionary and anti-government messages); Cartwright v. Meade, No. 7:08-cv-250, 2008 WL 2944668, at n.2 (W.D. Va. July 31, 2008) (holding in dicta that classification of Five Percenters as a security threat group and resulting confiscation of their materials did not state a claim under RLUIPA where there was no showing that plaintiff was substantially burdened in the exercise of his religion); Bells v. Ozmint, No. 6:06-2266, 2007 WL 1862668, at *3 (D.S.C. June 6, 2007) (confiscation of Five Percenter material did not violate RLUIPA).

Here, Defendants have presented evidence on summary judgment showing that they have given appropriate consideration to lesser restrictive alternatives to the ban of Nation of Israel as a religious group or organization within North Carolina prisons and have offered substantive, relevant explanations for why the group is not permitted to gain recognition as a religion. Moreover, Defendants' evidence, through the affidavits of Brown and Slagle, indicates that the RPC considered the group and concluded that, while the group was not suitable for official recognition, Plaintiff could worship his faith in whatever fashion his custody level permitted. (Doc. No. 37 at ¶ 24). This would include private worship as to whatever his personal interpretation of his faith is—whether that be based on Nation of Israel beliefs or not—as long as he is not disruptive or presenting a threat to the institution and receipt of published materials so long as they were deemed acceptable by the publications policy. (Id. at ¶ 25).

In response to Defendants' arguments on summary judgment, Plaintiff does not deny that Nation of Israel is a racist and exclusionary group that promotes white supremacy. Instead, he argues that the group's racist message is justified because its "exclusionary rule" is mandated by various passages in the Bible and it also serves security purposes. That is, Plaintiff argues that the group's racist beliefs merely reflect "a firmly held religious conviction founded upon a clear and unambiguous scriptural mandate to wit; Exodus 19:56; Deuteronomy 7:3-6; Ezra, Chapters 9-10 et seq.; Nehemiah 13:1-3, 24 et seq. Further, from a security standpoint, such exclusion is necessary to prevent militant black religious groups harboring violent gang members from entering and disrupting services." (Doc. No. 40 at 2). Plaintiff also argues that prison officials "condone[] the practices of black religious groups" that foster racist attitudes against whites. (Id.). Finally, Plaintiff contends that Defendants fabricated some of the evidence to support the summary judgment motion. He contends specifically that some of the allegedly racist literature found in Plaintiff's cell was not actually confiscated from his cell. (Id. at 11).

None of Plaintiff's contentions in his response raise a genuine issue of material dispute as to his RLUIPA and First Amendment claims against Defendants based on the prison's refusal to recognize Nation of Israel as an approved religion in the prison and Defendants are therefore entitled to summary judgment as to this claim. Most significantly, Plaintiff has presented no evidence on summary judgment to show how any conduct by Defendants is preventing him from exercising his purported religion.[2] That is, Plaintiff has not presented any evidence that

---

[2] Furthermore, specifically as to Plaintiff's RLUIPA claim, while RLUIPA authorizes injunctive and declaratory relief, it does not waive the NCDPS' Eleventh Amendment immunity, nor does it authorize suits for money damages against prison officials, whether in their official or individual capacities. Rendelman v. Rouse, 569 F.3d 182, 187 (4th Cir. 2009); accord Sossamon v. Texas, 131 S. Ct. 1651, 1663 (2011). Lastly, to state a RLUIPA claim against an individual, a plaintiff must establish that they acted with the requisite intent. That is, in the RLUIPA context,

Defendants have in any way hampered his ability to participate in both Messianic Jewish and Christian services, or his ability to continue practicing his white supremacist and anti-Semitic beliefs, however deplorable they may be.  In other words, Plaintiff points to no specific religious practices that he is being deprived of participating in.  On the other hand, Defendants have presented evidence that Plaintiff can fulfill his religious duties by continuing to participate in Messianic Jewish and Christian services in prison.  While attending these services and observances, Plaintiff is certainly free to entertain whatever racist and anti-Semitic thoughts he wishes to entertain.  This Court simply will not, however, order the North Carolina prisons to officially recognize as a religion a group that espouses hateful and racist rhetoric, thus subjecting this group to certain protections under prison regulations and policies.  Moreover, as noted, the Court finds most compelling the reasons given by Defendants for refusing to recognize Nation of Israel—that recognizing such a group as an approved religion would no doubt jeopardize institutional security.   In sum, Defendants are entitled to summary judgment as to this claim.

**2. Restrictions on Possession of Religious Texts**

As part of his claim, Plaintiff also contends that Defendants violated his rights by restricting his possession of religious texts.  In support, Plaintiff broadly alleges that the numeric restriction on the publications he is permitted to possess is unconstitutional.  This claim fails.  The only materials seized from Plaintiff were outlined by Slagle as racist and violent—they were not seized because they were excessive.  See (Doc. No. 36 at ¶¶ 14-15, Ex. E).  Moreover, the materials speak for themselves as to why restrictions on such materials are necessary, as they

---

such claim requires more than negligence and is satisfied by intentional conduct.  Lovelace v. Lee, 472 F.3d 174, 194-95 (4th Cir. 2006).   Here, Plaintiff has failed to establish such intent by Defendants, and his claims against them fail for this additional reason.

contain violent, racist, and gang-related materials. (Id.). Thus, the prison's restrictions on Plaintiff's ability to possess these materials serve a compelling governmental interest of maintaining institutional safety and security. (Id. at ¶¶ 16-18). Accord Bruton v. McGinnis, 110 F.3d 63 (6th Cir. 1997) (unpublished) (concluding that "[t]he district court properly found that the ownership of materials and symbols associated with the hatred of blacks and Jews could incite violence among a segment of society already prone to violence. [The Plaintiff] was allowed to order, from an approved vendor, other Christian Identity materials less likely to incite violence."); Borzych v. Frank, 439 F.3d 388, 391 (7th Cir. 2006) (upholding a ban on religious publications that "promote violence to exalt the status of whites and demean other races"). Furthermore, Defendants have shown on summary judgment that Plaintiff was permitted to order Nation of Israel materials that meet the publications policy and which do not promote racist or violent ideas. In response, Plaintiff has simply not raised a genuine issue of disputed fact as to his claim that his constitutional rights were violated based on the prison's restriction on his right to possess certain religious texts.

**B.     Plaintiff's Claim for Violation of His First Amendment Right to Access to the Courts**

Plaintiff also purports to bring a First Amendment claim for a violation of his right to access to the courts. Federal courts have long recognized that inmates have a fundamental right to access to the courts and protect that right "by prohibiting state prison officials from actively interfering with inmates' attempts to prepare legal documents." Lewis v. Casey, 518 U.S. 343, 350 (1996); Michau v. Charleston Cnty., 434 F.3d 725, 728 (4th Cir. 2006). "[M]eaningful access to the courts is the touchstone." Lewis at 351. Thus, to sustain a claim of denial of access to the courts, a prisoner must show actual injury, i.e., that the prisoner's efforts to pursue a legal

claim were hindered. Id. at 351-52; accord O'Dell v. Netherland, 112 F.3d 773, 776 (4th Cir. 1997) (holding an inmate wishing to establish an unconstitutional burden on his right of access to the courts must show actual injury to the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts). This right does not extend to include the right to "litigate effectively once in court." Lewis, 518 U.S. at 354 (disclaiming language in Bounds v. Smith, 430 U.S. 817, 825 (1977), suggesting otherwise).

An inmate may not rely on conclusory allegations but, instead, must identify the specific claim he has been unable to pursue or the specific procedural default arising from official interference. Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996). Specificity is necessary so that prison officials are not required to file unnecessary responses to speculative allegations. Id. See Michau, 434 F.3d at 728 (where the denial of access to courts claim failed because the plaintiff did not specifically explain how he was injured by any limitations on his access to the law library); Harden v. Bodiford, 442 F. App'x 893, 896 (4th Cir. 2011) (finding that an inmate cannot rely on conclusory allegations to establish a claim of denial of access to the courts). In fact, inmates have no absolute constitutional right to representation and "NCPLS attorneys are at liberty to use their professional judgment and are not obligated to undertake representation in virtually every case brought by inmates." Salters v. Butler, No. 5:06-CT-3073-H, 2006 WL 4691237, at *1 (E.D.N.C. Oct. 9, 2006) (unpublished).

Here, Plaintiff does not state how Defendants have impeded his access to the courts, aside from broadly speculating that Defendants are somehow responsible for the actions of NCPLS. These allegations do not plausibly give rise to an entitlement to relief for denial of access to the courts. Furthermore, Plaintiff does not plead an actual injury. Instead, Plaintiff claims that NCPLS' denial of representation amounts to a constitutional injury, which he contends is

17

somehow attributable to Defendants, but he does not explain how. Plaintiff does not claim that there was or is an impediment to his ability to communicate with the courts or file papers, that NCDPS' policies prevented him from accessing or communicating with the courts, or that Defendants have impeded his ability to communicate with NCPLS or private counsel. In sum, Plaintiff's allegations falls woefully short of establishing liability against Defendants for some alleged deprivation of access to the courts. In sum, as with his RLUIPA claim, Plaintiff has not come forward with evidence on summary judgment raising a genuine dispute of material fact as to whether Defendants violated his right to access to the courts. Therefore, Defendants are entitled to summary judgment as to this claim.

## IV. CONCLUSION

Plaintiff has failed to raise a genuine issue of material fact as to whether Defendants violated his rights to practice his religion under the RLUIPA or the First Amendment, or his First Amendment right to access to the courts. Defendants are therefore entitled to summary judgment.[3]

---

[3] Finally, Defendants also contend that Plaintiff's claims, which are for only declaratory and injunctive relief, are moot because Plaintiff has been transferred away from MVCI. The Court does not address Defendants' argument regarding mootness because the Court concludes that, in any event, Defendants are entitled to summary judgment on the merits.

**IT IS, THEREFORE, ORDERED** that:

1. Defendants' Motion for Summary Judgment, (Doc. No. 35), is **GRANTED**, and this action is dismissed with prejudice.

2. The Clerk is respectfully instructed to terminate this action.

Signed: August 1, 2017

Frank D. Whitney
Chief United States District Judge